UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                          :

ESTHER DAUDIER,                                    :

                            Plaintiff,     :             12 Civ. 206 (PAE)

                                          :         OPINION & ORDER

                     -v-                       :

                                          :

E&S MEDICAL STAFFING, INC. and FERNCLIFF   :
NURSING HOME COMPANY, INC.,

                                          :

                         Defendants.     :

                                          :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       Plaintiff Esther Daudier brings this action against E&S Medical Staffing, Inc. ("E&S")

and Ferncliff Nursing Home Company, Inc. ("Ferncliff"), alleging that defendants interfered, on

the basis of her race, with her right to make and enforce contracts under 42 U.S.C. § 1981.

Defendants move for summary judgment under Federal Rule of Civil Procedure 56(a). For the

reasons that follow, defendants' motions are granted.

I.      **Background and Undisputed Facts**[1]

     A.      **The Parties**

        Daudier is a black woman of Haitian descent.  Daudier Dep. 42; Daudier Decl. ¶ 2.  She

is trained as a Certified Nurse Assistant ("CNA").  Daudier Decl. ¶ 3.

        Ferncliff operates a nursing home located in Rhinebeck, New York.  Polera Decl. ¶ 3.

E&S is a temporary staffing agency that provides contract medical personnel to medical facilities

throughout New York State.  *Id.* ¶ 2.  Between 2004 and February 11, 2010, E&S provided

Ferncliff with temporary medical personnel pursuant to their May 14, 2004 agreement.  *See id.*

¶¶ 1, 3; Kelly Decl. ¶ 4; *see also id.* Ex. 1 (the "Ferncliff/E&S Agreement").  Daudier was not a

party to that agreement.  Kelly Decl. ¶ 6 & Ex. 1.

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion, including: Ferncliff's Local Rule 56.1 Statement, Dkt. 65 ("Def. 56.1"); Daudier's Local Rule 56.1 Counterstatement, Dkt. 78 ("Pl. 56.1"); the Affidavit of Debra Polera, Dkt. 63 ("Polera Decl."); the Affidavit of Carl Kelly, Dkt. 61 ("Kelly Decl."); the Affidavit of Karen Tompkins, Dkt. 62 ("Tompkins Decl."); the Affidavit of Patricia Corrado, Dkt. 60 ("Corrado Decl."); the Affidavit of Ernest Stolzer, Dkt. 66 ("Stolzer Decl."), and the exhibits attached thereto, including Exhibit 8, which is the April 15, 2013 Deposition of Esther Daudier ("Daudier Dep."), and Exhibit 11, which is the deposition of Eric Giaquinto ("Giaquinto Dep."); the Affidavit of Jessica Satriano, Dkt. 70 ("Satriano Decl."), and the exhibits attached thereto, including the July 10, 2013 Deposition of Esther Daudier ("Daudier VM Dep.") and the Deposition of Andre Soleil ("Soleil Dep."); the Declaration of Subhana Rahim, Dkt. 77-13 ("Rahim Decl."); the Declaration of Esther Daudier, Dkt. 77-2 ("Daudier Decl."); and the Reply Declaration of Ernest Stolzer, Dkt. 82 ("Stolzer Reply Decl."). References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited therein.  Where facts stated in a party's Statement of Material Facts are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

### B.     Daudier's Employment

On May 23, 2008, Daudier signed an employment contract with E&S.  Daudier Dep. 59;

Daudier Decl. ¶ 8; *see* Dkt. 77-17 (the "Employment Agreement").[2]  In spring 2008, E&S

assigned Daudier to work as a CNA at Ferncliff.  Polera Decl. ¶ 6; Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.

Daudier continued to receive her hourly wage directly from E&S while she worked at Ferncliff.

Polera Decl. ¶ 4; Kelly Decl. ¶ 5.  Daudier had no direct employment contract with Ferncliff.

Daudier Dep. 29.  Daudier's duties included caring for elderly residents—including cleaning,

bathing, feeding, performing range of motion exercises on their limbs, and checking their vital

signs.  Daudier Decl. ¶ 11.

Daudier continued to work at Ferncliff until January 17, 2010.  Polera Decl. ¶¶ 7, 13;

Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.  This litigation arises primarily from events that occurred on

January 16 and 17, 2010.  Daudier worked the overnight shift that spanned from January 16,

2010 at 11 p.m. to January 17, 2010 at 7 a.m.  Tompkins Decl. ¶ 4; Daudier Decl. ¶ 18.  On the

morning of January 17, 2010, Karen Tompkins, the Nursing Supervisor at Ferncliff, arrived at

work at 7 a.m.  Tompkins Decl. ¶¶ 2–3.  Upon her arrival, Tompkins was informed by Katherine

Weisberg, a nurse, that a resident ("Resident J") had complained about Daudier's treatment of

her during the overnight shift.  *Id.* ¶ 5.  Tompkins requested a written report, which Weisberg

provided to her on January 18, 2010.  *Id.*; *see also id.* Ex. 1. (the "Report").  After reviewing the

Report, which is discussed in more detail *infra*, Tompkins learned that several other complaints

---

[2] Daudier initially testified that she signed an employment contract with and began working for
E&S in 2007, not 2008.  Daudier Dep. 27, 30; *see also* Compl. ¶¶ 12–13.  However, she later
amended her testimony to state that her employment began on May 23, 2008.  This is
corroborated by the date on her employment agreement.  Whether Daudier began her
employment in 2007 or 2008, however, does not materially affect the Court's decision here.

had been made against Daudier relating to the January 16–17 overnight shift. *Id.* ¶ 6; *see also id.* Ex. 1.[3]

On January 17, 2010—*i.e.*, before Tompkins received the Report—she was under the impression that only one complaint had been made against Daudier relating to the January 16–17 overnight shift. *Id.* ¶ 6. Tompkins called her supervisor, Patricia Corrado, the Assistant Director of Nursing at Ferncliff. *Id.* ¶ 7; Corrado Decl. ¶ 2. On that call, Tompkins advised Corrado of Resident J's complaint against Daudier. Tompkins Decl. ¶ 7; Corrado Decl. ¶ 3. When a complaint of misconduct is made against a Ferncliff employee or temporary staff member, Ferncliff's practice is to suspend the accused employee without pay pending the completion of the investigation. Corrado Decl. ¶ 6; Kelly Decl. ¶ 17; Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50. Accordingly, Corrado directed Tompkins to call E&S and ask E&S to inform Daudier not to report to work at Ferncliff until an investigation into the allegation of abuse had been completed. Tompkins Decl. ¶ 7; Corrado Decl. ¶ 5.

Later on January 17, 2010, Tompkins called E&S and spoke with Debra Polera, who was the Chief Financial Officer of E&S and was in charge of staffing the nurses. Tompkins Decl. ¶ 8; Polera Decl. ¶¶ 1, 7; Daudier Decl. ¶ 12. Tompkins informed Polera of the fact, but not the substance, of Resident J's complaint against Daudier. Tompkins Decl. ¶ 8; Polera Decl. ¶¶ 7–8. Tompkins also informed Polera that Resident J did not like "women of color." Polera Decl. ¶ 7. Tompkins asked that Polera instruct Daudier not to report to work at Ferncliff for her next scheduled shift, but Polera told Tompkins to call Daudier directly, *see* Tompkins Decl. ¶ 8,

---

[3] Daudier objects to the admissibility of the Report, arguing that it (1) it is hearsay and (2) was not produced during discovery. *See, e.g.*, Pl. 56.1 ¶ 21. First, the Report's relevance here is not for the truth of the allegations contained therein, but rather their effect on the listener, *i.e.*, in explaining the actions of those Ferncliff employees who read the Report. Second, it *was* produced during discovery, on December 17, 2012. *See* Stolzer Reply Decl. ¶ 4 & Ex. 3; Dkt. 77-19.

apparently because Polera was not in the office and thus did not have Daudier's phone number, *see* Polera Decl. ¶ 7.

On January 17, 2010, after speaking with Polera, Tompkins called Daudier directly and left her a voicemail.  Tompkins Decl. ¶¶ 9, 11.  On that voicemail, Tompkins states:

> Hello Esther, Karen Tompkins at Ferncliff.  I hate to call but there were some complaints on the night shift last night, on 3A.  Um, some verbal, verbal complaints there.  So, what we had to do is, is, is ask the nurse what happened, and until we can find out what, what happened, we have to ask you to stay home tonight.  And um, I'm sure everything is fine.  This one lady, um, just doesn't particularly like people of color I believe.  So, um, anyway we have to look into this before we have you back.  Thank you Esther.  Its Sun- Sunday around 12:30.  OK call me. Thanks, bye.

Satriano Decl. Ex. 6 (the "Voicemail").[4]  Tompkins attests that, at the time she left the Voicemail, she still had not read the Report and thus was under the impression that Resident J's complaint was the only complaint from that night.  Tompkins Decl. ¶ 11.  She further attests that her statement that "one lady, um, just doesn't particularly like people of color," was a reference to a prior complaint Resident J had made months earlier about being cared for by another black nurse, Rose Anglin.  *Id.* ¶¶ 10–11.  Tompkins attests that she added this detail to express her hope that the complaint would be resolved in Daudier's favor.  *Id.* ¶ 11.  Daudier never returned Tompkins's call or otherwise responded to her message.  *Id.* ¶ 12.[5]  Daudier attests that she did

---

[4] As discussed in Part I(D) and III(A), *infra*, the recording of the Voicemail was not produced until after the original close of discovery.  Prior to its production, several witnesses who heard the Voicemail at various times offered their own recollection of its contents.  With the Voicemail now before the Court, the Court disregards that testimony and has reproduced here the text of the Voicemail.  Its admissibility for the purpose of this motion is discussed in Part III(A), *infra*.

[5] At her deposition, Daudier testified that she never worked with Tompkins, but would see her in the hallway and say hello.  *See* Daudier Dep. 45–46.  Daudier could not remember Tompkins's last name.  *Id.* at 46.  However, in her declaration, Daudier attests that she was particularly hurt by Tompkins's message because Daudier "worked very closely with Ms. Tompkins."  Daudier Decl. ¶ 27.

not return the call at the advice of Polera, who told Daudier that E&S would handle the situation. Daudier Decl. ¶ 31.

As noted, on January 18, 2010, Weisberg provided Tompkins with a written report explaining the complaints made against Daudier during the January 16–17 overnight shift. Tompkins Decl. ¶¶ 5, 14. The Report is not a model of clarity, but it appears to document four separate incidents involving four different residents. *See id.* Ex. 1. According to the Report, Resident S complained that Daudier called her a "pain in the ass"; Resident J reported that Daudier mocked her and would not help her with pain in her legs; Resident L complained that she was crying and was told by Daudier, "too bad"; and Resident I stated that she wet the bed because Daudier refused to take her to the bathroom. *Id.* Daudier denies the allegations in the Report. She attests that she never mistreated any resident, did not know the residents at issue, and was never informed about the substance of these complaints. *See* Daudier Decl. ¶¶ 40–49.

On January 19, 2010, Corrado received a copy of the Report. Corrado Decl. ¶ 9. Corrado thereafter called Daudier on several occasions and left her voicemails in an attempt, she attests, to obtain Daudier's side of the story; Daudier did not return Corrado's calls. *Id.* ¶ 12. On January 19, 2010, Corrado informed Carl Kelly, Ferncliff's Executive Director, that Ferncliff had commenced an investigation into the complaints against Daudier. *Id.* ¶ 10; Kelly Decl. ¶¶ 2, 16. Kelly also called Daudier on several occasions to obtain her version of the events, but Daudier did not return his calls. Kelly Decl. ¶¶ 18–19; Daudier Dep. 47–48; Polera Decl. ¶ 11. Daudier attests that she received several voicemails from Corrado and Kelly, but that Corrado's and Kelly's messages merely told her to call them back; she attests that the messages did not state the reason for the call, reference the residents' complaints of misconduct, or solicit Daudier's side of the story. Daudier Decl. ¶ 30. Daudier told Polera about the voicemails she had received, and,

as noted, Daudier attests that Polera told her not to return any calls from Ferncliff because E&S was handling the situation. *Id.* ¶ 31; *see also* Daudier Dep. 47 ("I did not call [Kelly back] because at that time I felt violated."). A few weeks after these complaints were first raised, Polera saw Kelly about an unrelated matter and told him to stop calling Daudier. Polera Decl. ¶ 12. Thus, after Tompkins left the Voicemail on January 17, 2010, neither Tompkins, Corrado, nor Kelly had any further contact with Daudier, and thus never heard her version of the alleged events. Tompkins Decl. ¶ 21; Corrado Decl. ¶¶ 13–14; Kelly Decl. ¶¶ 19–20.

After January 17, 2010, E&S did not assign Daudier to return to work at Ferncliff. Polera Decl. ¶ 13. It is undisputed that there was some period during which Daudier was not working at all, but that, at some point in 2010, E&S assigned Daudier to work full-time at a Veterans Administration ("VA") nursing home. The exact timing of this reassignment, however, is disputed. Polera attests that she reassigned Daudier to the VA home within one month of January 17, 2010. Polera Decl. ¶ 13. Daudier's brief also identifies February 2010 as her start date at the VA home. Pl. Br. 6. Daudier testified in her deposition that she began at the VA home in "late 2010," "probably in late November to early December." Daudier Dep. 31–32, 36. In her declaration, Daudier specifies that she began at the VA home in September 2010, after having been briefly assigned to Elant Nursing home in June 2010. Daudier Decl. ¶ 32; *see also* Daudier Dep. 76, 78 (referencing Elant). Daudier testified that during the interim period between her assignments to Ferncliff and the VA home, she remained under contract with E&S. Daudier Dep. 29–34, 53. However, because Ferncliff was E&S's only client at the time, E&S had no place to assign Daudier until it later found work for her at the VA home. *Id.* at 33–34. During that interim period, Daudier collected unemployment. Daudier Decl. ¶ 32.

It is undisputed that, whenever Daudier started at the VA home, she continued working there full-time as a contract employee for E&S until March 6, 2013.  Daudier Dep. 31–32; Def. 56.1 ¶ 60; Pl. 56.1 ¶ 60.  While working for E&S at the VA home, Daudier received a higher hourly rate than she had at Ferncliff.  Daudier Dep. 31.  On March 6, 2013, Daudier left the employ of E&S to begin full-time employment directly with the VA home; this provided her a higher hourly wage than E&S had paid, and health insurance that she previously had not received.  Daudier Dep. 30–31, 50.  E&S signed an addendum to Daudier's Employment Agreement releasing her from the non-compete clause contained therein.  Dkt. 77-17.  Daudier continues to be employed full-time by the VA home.  Daudier Dep. 31.

Daudier testified that, other than Tompkins's Voicemail, Ferncliff employees never told her that she could not work there because of her race and no Ferncliff employee ever made racist comments to her.  Daudier Dep. 44, 63, 68.  She also testified that no employee of E&S ever discriminated against her or made racist comments.  *Id.* at 72.

Daudier testified that Ferncliff residents made racist comments to her on two occasions. Sometime in 2008, a male resident told her to "[g]et out of here, you f'ing n'ger," or words to that effect.  *Id.* at 39, 41; *see also* Daudier Decl. ¶ 15 (male resident said "I hate niggers"). Daudier did not report this incident to Ferncliff or E&S.  Daudier Dep. 39, 41; Daudier Decl. ¶ 15.  The second occasion was the night of January 16–17, 2010; Daudier testified that, when she went to treat Resident J, Resident J told her to "s-up you f'ing n'ger [and] [t]hings like that." Daudier Dep. 40–42.  Daudier did not report this incident either.  *Id.* at 40–41.  In her declaration, however, Daudier attests that when she went to treat Resident J that night:  "Ms. J did not complain to me while I cared for her.  That evening at work was very typical and normal. There was nothing unusual about work that evening."  Daudier Decl. ¶ 19.

8

### C.      E&S's Contract with Ferncliff

As noted, between 2004 and February 11, 2010, E&S provided Ferncliff with temporary medical personnel pursuant to the Ferncliff/E&S Agreement.  In early 2010—*i.e.*, around the same time as the incident relating to Daudier—a financial dispute arose between E&S and Ferncliff as they were negotiating a new agreement.  Kelly Decl. ¶¶ 7, 14; Polera Decl. ¶ 18; Giaquinto Dep. 49–51, 61–65.  E&S was experiencing financial difficulties and believed that Ferncliff was delinquent in some of its payments to E&S.  Kelly Decl. ¶ 7; Giaquinto Dep. 63–65.  On February 1, 2010, Eric Giaquinto, the owner of E&S, presented Ferncliff with a new contract proposal and advised that if Ferncliff did not sign immediately he would stop E&S from providing Ferncliff with temporary staff.  Kelly Decl. ¶ 8 & Ex. 2; *see also* Giaquinto Dep. 50, 65.  Ferncliff refused this demand.  Kelly Decl. ¶ 9.  On February 11, 2013, E&S directed all its employees assigned to Ferncliff not to report for work.  *Id.* ¶ 10.  At this point, Ferncliff severed its relationship with E&S.  *Id.* ¶ 11.[6]

Two declarants attest that the end of the relationship between Ferncliff and E&S was strictly due to their financial disagreement and was unrelated to Daudier.  *See* Kelly Decl. ¶¶ 13–14 (participated in contract negotiations for Ferncliff); Polera Decl. ¶ 18 (CFO of E&S).  Daudier disputes this assertion, relying on Tompkins's Voicemail to Daudier.  *See* Pl. 56.1 ¶ 66.[7]

After terminating its contract with E&S, Ferncliff directly hired many of the staff that E&S had previously provided to Ferncliff.  Kelly Decl. ¶ 12.  More than half of the individuals

---

[6] These events are the subject of a separate lawsuit between E&S and Ferncliff in New York State Supreme Court, Orange County.  Stolzer Decl. ¶ 11.

[7] Daudier also relies on the affidavit of Andre Soleil, which, for reasons stated in Part I(D), *infra*, the Court has already ruled inadmissible.

hired by Ferncliff and five of the seven individuals hired as CNAs (Daudier's former position) were black. *Id.* Daudier was not among them.

### D.  Procedural History

This case has a long and baroque procedural history.  On January 11, 2012, Daudier filed the Complaint.  Dkt. 1 ("Compl.").  At the time, she was represented by Andre Soleil, Esq.  The Complaint pleads a single cause of action, pursuant to 42 U.S.C. § 1981, against Ferncliff and E&S, for their alleged interference, based on her race, with her contractual rights.  *Id.* ¶¶ 10–24.[8] It seeks $10 million in compensatory damages against each defendant, $100 million in punitive damages, and attorney's fees and costs.  *Id.* ¶ 25.

On March 9, 2012, Ferncliff filed an answer.  Dkt. 4.  On April 4, 2012, E&S filed an answer.  Dkt. 8.  Ferncliff and E&S asserted cross-claims against each other, each alleging that the other was contractually required to indemnify it for any liability to Daudier.  *See* Dkt. 4, 8.

On July 27, 2012, after court-ordered mediation failed, the Court held an initial pretrial conference.  At that conference, E&S expressed its intention to file a motion to disqualify Soleil as Daudier's counsel, and the Court set a briefing schedule for that motion.  Dkt. 15.  On August 23, 2012, the Court granted E&S's motion to disqualify Soleil:  Soleil had met with E&S representatives and signed a retainer agreement to represent E&S in a breach of contract action against Ferncliff, *see* Dkt. 35, at 1–2; after Soleil's relationship with E&S broke down, Soleil instigated this suit against E&S on behalf of Daudier, despite having had privileged discussions with E&S regarding events that gave rise to this action, *see id.* at 4.

---

[8] The Complaint refers to Daudier's race and national origin.  However, Daudier subsequently disavowed any intent to assert a discrimination claim based on her national origin.  *See* Daudier Decl. ¶ 56; Daudier Br. 9.

On November 15, 2012, Soleil filed a notice that Subhana Rahim, Esq., would be appearing on behalf of Daudier.  Dkt. 42.  The next day, the Court held a case management conference, at which Rahim was present, and directed the parties to submit a proposed case management plan and scheduling order by November 30, 2012.  On December 3, 2012, the Court endorsed the parties' proposed order, which provided for the close of fact discovery by March 18, 2013.  Dkt. 47.

On March 1, 2013, the Court received a letter from Ferncliff, seeking a request for extension of its time to take discovery due to the failure of both Daudier and E&S to respond to certain interrogatories and document production requests.  Dkt. 49.  Ferncliff asked that only it, not the other parties, be allowed to take discovery past the original deadline set forth in the Court's scheduling order, because neither Daudier nor E&S had noticed any depositions or served any discovery demands on Ferncliff by the original deadline.  *Id.*  On March 8, 2013, the Court granted Ferncliff's request, and extended its deadline to complete discovery until April 8, 2013.  Dkt. 48.  On March 12, 2013, the Court received a letter from Daudier's counsel requesting a corresponding extension of the discovery period.  Dkt. 50.[9]  On March 21, 2013, the Court held a telephone conference to address the issue and denied Daudier's request for an extension of the discovery period, because Daudier had not complied with her own discovery obligations.  Dkt. 52.

On April 5, 2013, Daudier failed to appear for her scheduled deposition due to a last-minute change in her work schedule.  The Court directed Daudier to appear for a deposition on

---

[9] Daudier also sought leave to amend her complaint to add retaliation claims against E&S based on conduct that had occurred in January 2013.  Dkt. 50.  The Court denied Daudier's request for leave to amend, without prejudice to raising these claims in a separate action.  Dkt. 52.  Daudier has since withdrawn her request to amend.  Rahim Decl. ¶ 14.

April 15, 2013, and ordered Daudier's counsel to reimburse Ferncliff for the stenographer's cancellation fee.  Dkt. 53–54.

On April 29, 2013, the Court received a timely letter from Ferncliff seeking leave to move for summary judgment.  Dkt. 55.  On May 6, 2013, the Court received a letter from E&S, joining in that motion.  Dkt. 56.  Daudier did not file a responsive letter.  On May 10, 2013, the Court held a pre-motion conference with the parties and set a briefing schedule for defendants' motions.  *See* Stolzer Decl. Ex. 7 ("PMC Tr.").  At that conference, in addition to hearing a preview of the parties' arguments, the Court addressed a number of issues worthy of note here. First, Ferncliff requested that Daudier be precluded from offering any evidence of the Voicemail, because Daudier had failed to preserve a copy of it and produce it during discovery.  *Id.* at 3–7. Daudier's counsel represented that the Voicemail no longer exists, but that several individuals who had heard the Voicemail could provide sworn declarations as to its contents.  *Id.* at 5, 7. The Court reserved decision on the issue and directed the parties to brief the admissibility of the Voicemail in their summary judgment papers.  *Id.* at 7–8.  Second, Daudier's counsel represented that Daudier would seek to offer testimony from Soleil; however, Soleil was never identified by Daudier as a potential witness during the discovery period and defendants had not had a chance to depose him.  *Id.* at 12–17.  Accordingly, the Court ruled that Soleil's testimony was "out of bounds."  *Id.* at 17.  Finally, the Court concluded by explaining the requirements of Local Rule 56.1 to counsel in detail.  *Id.* at 22–23.

On June 7, 2013, Ferncliff timely filed its motion for summary judgment.  Dkt. 64 ("Ferncliff Br.").  On June 24, 2013, the Court received a letter from Daudier's counsel, Ms. Rahim, explaining that Soleil had recently located a copy of the Voicemail, which he had forwarded to Rahim who in turn produced it to defense counsel.  Dkt. 68.  On June 26, 2013, the

Court held a telephone conference with the parties to address the effect of the post-discovery production of the Voicemail on the pending summary judgment motion. The Court reopened discovery for the limited purpose of allowing defendants to depose Daudier and Soleil regarding the circumstances of the Voicemail's disappearance and recovery. Dkt. 69. On July 10, 2013, those depositions were taken. Dkt. 70.

On July 17, 2013, Ferncliff submitted a letter brief in further support of its previously filed motion for summary judgment. Dkt. 76 ("Ferncliff Supp. Br."). On the same date, E&S filed an affidavit joining in Ferncliff's motion for summary judgment. Dkt. 73 ("E&S Br."). On July 27, 2013,[10] Daudier filed her opposition to these motions. Dkt. 77 ("Daudier Br."). On August 2, 2013, Ferncliff filed a reply. Dkt. 85 ("Ferncliff Reply Br.").

## II.    Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the

---

[10] The Court excused Daudier's untimely filing of her opposition papers. Dkt. 81.

13

outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

### III.    Discussion

Before addressing the merits of Daudier's § 1981 claim, the Court first addresses a threshold issue about the admissibility of a key piece of evidence.

### A.    Admissibility of the Voicemail

During discovery, Daudier and her counsel were initially unable to locate the recording of the Voicemail (*i.e.*, the message Tompkins left for Daudier on January 17, 2010).  On June 7, 2013, when Ferncliff filed its original motion for summary judgment, the Voicemail had still not been produced; accordingly, Ferncliff sought an order precluding the admission of any testimony relating to the Voicemail.  *See* Ferncliff Br. 19–25.  However, on June 24, 2013, Daudier's counsel, Rahim, notified the Court that Daudier's former counsel, Soleil, had located a copy of the recording of the Voicemail that he had made, and that Rahim had produced it to defendants. Dkt. 68.  The Court therefore allowed defendants to reopen discovery for the purpose of deposing Daudier and Soleil regarding the Voicemail's disappearance and discovery.  Dkt. 69. During those depositions, Soleil and Daudier explained the following series of events.

The original Voicemail was located on Daudier's cell phone.  At some point after Daudier commenced this litigation, Daudier switched cell phones and lost the original recording of the Voicemail.  Daudier VM Dep. 127; Soleil Dep. 11; *see also* PMC Tr. 5–7.  However,

14

Daudier had made several copies of the recording.  One such copy was made by Soleil in February or March 2010.  Soleil Dep. 17.  Soleil testified that he copied the Voicemail using a digital voice recorder function on his iPhone and then synced his iPhone with his computer such that the Voicemail was stored in his iTunes library.  *Id.* at 24.  He also copied the recording onto a CD, which he subsequently misplaced.  *Id.* at 25, 28.  Soleil did not realize that he had misplaced the CD until fall 2012, around the time he was disqualified.  At that point, when he searched for the recording, he could not find it.  *Id.* at 11–12.  At Rahim's request, Soleil made another search for the recording in February or March 2013, but again could not locate it.  *Id.* at 13.  On June 18, 2013, Rahim requested permission to look through Soleil's files herself.  *Id.* at 16.  At that point, Soleil finally recalled having synced the recording from his iPhone to his iTunes, and was able to locate the recording on his computer.  *Id.* at 10, 17.  He forwarded the recording to Rahim, who produced it to defense counsel the next day.

At her deposition, Daudier revealed the existence of another copy of the recording. Daudier had made this copy on a tape recorder and sent it to her prior attorney, Mr. Halsband. Daudier VM Dep. 94.  Halsband eventually sent it back to Daudier after his representation of her ended.  *Id.* at 97.  Daudier thought she had misplaced that tape, but her husband found it while cleaning out their car in June 2013, shortly after the other recording had been produced.  *Id.* at 110, 166.  On July 10, 2013, at the Court's direction, Daudier produced that tape as well.

Following these depositions, defendants were given the opportunity to submit supplementary briefing on the effect of the Voicemail's late production.  On July 17, 2013, Ferncliff filed a letter brief.  In its brief, Ferncliff does not concede the authenticity of the recordings produced, noting that one has a time and date voiceover at the beginning while the other does not, *see* Ferncliff Supp. Br. 1 & n.2, but Ferncliff does not seriously contend that

either recording has been tampered with. Ferncliff primarily argues that it has been prejudiced by the late production of the Voicemail and that the Voicemail should therefore be precluded. *Id.* at 2–3. In the alternative, Ferncliff asks that the Court impose on Daudier the attorney's fees and costs of the additional depositions related to the Voicemail. *Id.* at 3.

To be sure, Daudier and her various counsel have been extraordinarily delinquent in their discovery obligations. Daudier clearly did not appreciate, let alone take seriously, her duty to try to preserve relevant evidence. Both of Daudier's counsel, Soleil and Rahim, failed to impress upon her that responsibility. Rahim inherited a messy situation, but apparently she did not take her discovery obligations seriously until it became clear, at the May 10, 2013 pre-motion conference, that she might be precluded from offering evidence of the Voicemail were it not produced. However, in the Court's judgment, the lion's share of the blame falls on Soleil, who should have appreciated the gravity of misplacing a piece of evidence central to his client's case. Soleil's conduct throughout this case has demonstrated a general disregard for his professional and ethical duties; that Soleil did not recall the location of the Voicemail until Rahim asked to come and personally search his files is reflective of this attitude. Thus, although Daudier, the client, certainly shares in the blame, it would work an extreme prejudice on her to exclude this important evidence due to events for which her former, conflicted lawyer was primarily at fault. *See Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004) ("[P]reclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution.").

The Court is mindful that defendants are prejudiced to some degree by Daudier's late production. However, that prejudice is mitigated for two reasons. First, defendants have known about the existence and basic content of the Voicemail throughout this litigation. Thus, its late

production should not have materially affected defendants' litigation strategy.  Second, to guard against such prejudice, the Court both reopened discovery and gave defendants the opportunity to file supplemental briefing addressing the Voicemail.  Defendants have taken that opportunity. Accordingly, the Court declines to preclude the Voicemail on this motion.

Finally, although it is a closer question, the Court declines to impose costs on Daudier relating to the late production.  Defendants, quite rightly, sought to reopen discovery when the Voicemail was produced.  However, the discovery relating to the late production was limited:   It consisted of two depositions regarding the circumstances of the Voicemail's disappearance and recovery, as the contents of the Voicemail had already been covered during the regular discovery period.  Although it is not concretely clear what costs are attributable to the Voicemail's late production, these costs are likely a small fraction of the total costs incurred over the course of this long and hard-fought litigation.  Defendants have ultimately prevailed, leaving Daudier with no recovery.  Because the fault primarily lies with Daudier's former counsel, Soleil, not her, the Court declines to compound Daudier's defeat.

### B.     Daudier's § 1981 Claim[11]

The Complaint alleges that defendants violated Daudier's right to make and enforce contracts under 42 U.S.C. § 1981.  It alleges that Ferncliff was aware of Daudier's employment contract with E&S and "intentionally demanded that E&S terminate" this contract based on Daudier's race.  Compl. ¶¶ 19, 21, 23.  The Complaint also alleges that E&S terminated Daudier's employment contract "with reckless indifference to [her] federally protected rights." *Id.* ¶ 18.  After setting forth the relevant legal framework, the Court addresses Daudier's claim against each defendant.

### 1.     Legal Framework

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  The right to make and enforce contracts "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).  As the Supreme Court has explained, "[s]ection 1981 offers relief when racial discrimination . . . impairs an existing contractual relationship, so long as the

---

[11] In her brief in opposition to defendants' summary judgment motions, Daudier argues, for the very first time, that defendants' actions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  *See* Daudier Br., *passim*.  Although Daudier asserts that the Complaint is "sufficient to establish a *prima facie* case under both Title VII and 42 U.S.C. § 1981," *see* Daudier Br. 10 n.36, the Complaint in fact is devoid of any reference to Title VII. The Complaint's invocation of "42 U.S.C. § 1981 and other provisions of Federal and State law," *see* Compl. ¶ 4, is insufficient to put defendants on notice of a Title VII claim.  Because Daudier raises this claim for the first time in opposition to summary judgment, it is waived.  *See Rojo v. Deutsche Bank*, 487 F. App'x 586, 588–89 (2d Cir. 2012) (summary order) (citing *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006)); *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (summary order) (same); *Malmsteen v. Universal Music Grp.*, No. 10 Civ. 3955 (PAE), 2013 WL 1694402, at *9 (S.D.N.Y. Apr. 19, 2013) (collecting cases).

plaintiff has or would have rights under the existing . . . contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

Like claims brought under Title VII, Daudier's § 1981 claim is analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  Daudier "must first establish a prima facie case of discrimination by demonstrating: (1) membership in a protected class; (2) that [s]he was impaired by the defendant in the making or enforcing of a contract; and (3) circumstances surrounding that impairment give rise to an inference of discrimination." *Underdog Trucking, LLC v. Cellco P'ship*, 514 F. App'x 31, 32 (2d Cir. 2013) (summary order) (citing *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000)); *accord Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 1 F.3d 1085, 1087 (2d Cir. 1993) (per curiam).

"Once the plaintiff has established a prima facie showing of discrimination, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action." *Underdog Trucking*, 514 F. App'x at 32 (citing *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010)).  "The defendant 'must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the adverse action.'" *Id.* (emphasis in original, alteration omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). "Once the defendant proffers a legitimate, nondiscriminatory reason for the challenged action, 'the presumption of discrimination arising with the establishment of the prima facie case drops from the picture.'" *Id.* at 32–33 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2010)).  "The burden then shifts back to the plaintiff to 'come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.'"

19

*Id.* at 33 (quoting *Weinstock*, 224 F.3d at 42). "This requires the plaintiff to produce 'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the adverse action.'" *Id.* (alterations omitted) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)).

### 2.      Ferncliff

Daudier has sufficiently established a *prima facie* showing of discrimination by Ferncliff under § 1981. It is undisputed that she satisfies the first element—she is a member of a protected class. *See* Daudier Dep. 42; Daudier Decl. ¶ 2. Ferncliff contests Daudier's ability to establish the other two elements, but those arguments are unavailing.

As to the second element, Ferncliff argues that Daudier's contractual rights were never impaired, because "the undisputed evidence in this case proves that [Daudier's] employment contract with E&S was *never* terminated by E&S." Ferncliff Br. 9 (emphasis in original). It is true that Daudier's employment contract with E&S was never terminated. *See* Daudier Dep. 29–34, 53. However, Daudier's contract need not have been *terminated* in order for her to suffer an adverse employment action under § 1981. "Courts have described the type of employment action that gives rise to a Section 1981 claim as a 'materially adverse change in the terms and conditions of employment.'" *Campbell v. Grayline Air Shuttle, Inc.*, 930 F. Supp. 794, 802 (E.D.N.Y. 1996) (collecting cases). "A materially adverse change 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities' and 'might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Patrolmen's Benevolent Ass'n of City of*

*N.Y. v. City of N.Y.*, 310 F.3d 43, 51 (2d Cir. 2002) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

Here, Tompkins, on behalf of Ferncliff, called E&S's Polera and asked her to instruct Daudier not to return to work until the investigation against Daudier had been completed. Tompkins Decl. ¶ 8.  When Polera told Tompkins to call Daudier herself, Tompkins called Daudier and left a voicemail, telling her not to return to work at Ferncliff until the matter had been cleared up.  *Id.* ¶¶ 9, 11; *see* Satriano Decl. Ex. 6.  Thus, Daudier was effectively suspended without pay pending the results of its investigation, in accord with Ferncliff's standard practice. Corrado Decl ¶ 6; Kelly Decl. ¶ 17.  As a result, Daudier did not work at Ferncliff after January 17, 2010, and because Ferncliff was E&S's only customer at the time, that effectively meant that Daudier could not work anywhere for E&S.  *See* Daudier Dep. 33–34; Daudier Decl. ¶ 32.  Thus, for a period of between one and nine months, Daudier was effectively unemployed.  *See* Polera Decl. ¶ 13 (one month); Daudier Decl. ¶ 32 (five or nine months).  To be sure, Ferncliff's request that Daudier not return to work likely accounted for only three or four weeks of this period, at most, because as of February 11, 2010, E&S and Ferncliff no longer had a working relationship and Daudier may have been out of a job anyway.  Nevertheless, a reasonable jury could find that Ferncliff's request that Daudier stay home pending the investigation—effectively a suspension without pay—was a materially adverse employment action.  *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 236 F.3d 208, 223–24 (2d Cir. 2001) (one-week suspension without pay was sufficient to support jury finding of adverse employment action, even where employee was later reimbursed); *Endrisse v. Marriott Int'l, Inc.*, 757 F. Supp. 2d 381, 389 (S.D.N.Y. 2010) (temporary suspension pending investigation was adverse employment action).

As to the third element, Ferncliff argues that the Voicemail is insufficient to give rise to an inference of discrimination, because Daudier admits that "nothing stated in the voicemail was racially disparaging."  Ferncliff Reply Br. 7; *see also* Ferncliff Br. 14–15.  But whether Tompkins's Voicemail was disparaging or not, it explicitly references Daudier's race shortly after informing her that she would need to stay home pending the investigation.  Tompkins states, in pertinent part, "[U]ntil we can find out what, what happened, we have to ask you to stay home tonight.  And um, I'm sure everything is fine.  This one lady, um, just doesn't particularly like people of color I believe.  So, um, anyway we have to look into this before we have you back."  Satriano Decl. Ex. 6.  Tompkins attests that her reference to the resident's dislike for people of color was included out of sympathy and to suggest to Daudier that the complaint would be resolved in her favor.  Tompkins Decl. ¶ 11.  A reasonable jury might credit that testimony, and, from the Court's review of the Voicemail, Tompkins's tone does come across as sympathetic.  But a reasonable jury might also interpret Tompkins to be stating that Daudier could not return to work *because* the resident did not like people of color and, implicitly, because Ferncliff was deferring to that racial prejudice.  Accordingly, Daudier has established a *prima facie* case.  The burden therefore shifts to Ferncliff to demonstrate a legitimate, non-discriminatory reason for suspending Daudier.  *See Spiegel*, 604 F.3d at 80.

Ferncliff has met that burden.  On the morning of January 17, 2010, Tompkins learned from Weisberg that a resident complained of mistreatment by Daudier.  Tompkins Decl. ¶ 6.  After consulting with Corrado, Tompkins took steps—first by calling Polera, then by calling Daudier directly—to request that Daudier stay home from work pending Ferncliff's investigation into the allegations.  Tompkins Decl. ¶¶ 7–9, 11; Corrado Decl. ¶ 5; Polera Decl. ¶¶ 7–8.  It is undisputed that Tompkins's actions were in accord with Ferncliff's standard policy following

resident complaints of mistreatment.  Corrado Decl. ¶ 6; Kelly Decl. ¶ 17; Def. 56.1 ¶ 50; Pl.

56.1 ¶ 50.  Moreover, although Tompkins initially acted under the impression that there had been

only one complaint that evening, she shortly thereafter learned of four complaints.  Tompkins

Decl. ¶¶ 6 & Ex. 1.  As of February 11, 2010, when Ferncliff's relationship with E&S was

terminated, Ferncliff had not yet completed its investigation into the incident, because Daudier

had not returned any calls from Ferncliff employees.  *See id.* ¶ 12; Kelly Decl. ¶¶ 18–19;

Corrado Decl. ¶ 12.  Therefore, in accord with Ferncliff's policy of suspending employees

without pay during the pendency of an investigation, Daudier was not asked to return to work.

Ferncliff has therefore set forth sufficient evidence that, if believed by the trier of fact, would

support a finding that Daudier's suspension was not the product of discriminatory motive, but

rather Ferncliff's desire to investigate the allegations of abuse.  The burden therefore shifts back

to Daudier to present evidence that Ferncliff's proffered non-discriminatory reason was mere

pretext for actual discrimination.  *See Weinstock*, 224 F.3d at 42.

Daudier has not met that burden.  Tompkins's comment that "[t]his one lady, um, just

doesn't particularly like people of color I believe" is the only piece of evidence offered by

Daudier that suggests discriminatory motive on the part of any Ferncliff employee.  But Daudier

offers no evidence to suggest that Ferncliff's decision to effectively suspend her pending its

investigation into allegations of abuse against her was pretext for racial animus.  Quite the

contrary, Daudier specifically testified that Ferncliff employees never made any other race-based

comments to her.  Daudier Dep. 44, 63, 68.[12]  By comparison, just a few months earlier, Resident

---

[12] On two occasions, Daudier testified, Ferncliff residents directed racial slurs towards her, but Daudier never informed anyone at Ferncliff about these incidents (and Daudier's declaration contradicts her deposition testimony as to one of them).  *See* Daudier Dep. 39, 41; Daudier Decl. ¶ 15.

J had expressed her dislike for a different black nurse, Rose Anglin, but Ferncliff did not suspend Anglin, because there was no accompanying allegation of mistreatment.  Tompkins Decl. ¶ 10. Anglin continues to work at Ferncliff.  *Id.*  Moreover, just a few weeks after Daudier's suspension began, Ferncliff terminated its relationship with E&S, and when it rehired some of E&S's staff, five of the seven nurses hired for the position held by Daudier were black.  Kelly Decl. ¶ 12.  Daudier "was obliged to produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the [adverse employment action].'"  *Van Zant*, 800 F.3d at 708 (second alteration in original) (quoting *Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir. 1994)).  Daudier has adduced no such evidence.

Accordingly, Ferncliff's motion for summary judgment is granted.[13]

---

[13] Daudier also appears to argue that she was a third-party beneficiary of the contract between Ferncliff and E&S, and that Ferncliff interfered with Daudier's rights under that contract. Daudier Br. 18.  Although the Supreme Court has reserved decision on the question whether a third-party intended beneficiary of a contract may sue under § 1981, *see Domino's Pizza*, 546 U.S. at 476 n.3, the Second Circuit has answered that question in the affirmative, *see Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1339 (2d Cir. 1974); *see also Macedonia Church v. Lancaster Hotel L.P.*, 270 F.R.D. 107, 115 (D. Conn. 2010).  Nevertheless, Daudier's claim fails for two reasons.  First, "[i]n determining whether a party is a third-party beneficiary to a contract for the purposes of a § 1981 claim, the court looks to the law of the forum state."  *Macedonia Church*, 270 F.R.D. at 115 (citations omitted).  Under New York law, "[a] non-party to a contract . . .  lacks standing to enforce the agreement in the absence of terms that clearly evidence an intent to permit enforcement by the third party in question."  *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (citation and alteration omitted).  No such intent is evidenced in the agreement between Ferncliff and E&S.  *See* Kelly Decl. Ex. 1.  Second, even assuming Daudier had some rights in this agreement, Daudier has failed to adduce any evidence that would suggest that Ferncliff's decision to terminate its contract was based on racial animus towards Daudier, rather than the parties' financial dispute and E&S's decision to order its nurses to stop providing services at Ferncliff.  *See* Kelly Decl. ¶¶ 7–11, 13–14; Polera Decl. ¶ 18; Giaquinto Dep. 49–51, 61–65.

### 3.      E&S

As to E&S, Daudier has not made out a *prima facie* case of discrimination, because she cannot point to any adverse action taken by E&S against her, nor any evidence suggesting that E&S's actions (or inactions) occurred under circumstances giving rise to an inference of discrimination.  *See Brown*, 221 F.3d at 339; *Mian*, 1 F.3d at 1087.  As noted, Ferncliff's Tompkins initially asked E&S's Polera to direct Daudier to stop reporting to work at Ferncliff. Polera declined to do so and informed Tompkins that she would have to call Daudier directly. Tompkins Decl. ¶ 8; Polera Decl. ¶ 7.  It was thus *Ferncliff* who effected Daudier's *de facto* suspension.  Daudier points to no evidence that E&S could have persuaded Ferncliff otherwise. To the contrary, Polera suggested to Tompkins that she allow Daudier to continue working at Ferncliff on a different floor, so that she would not have to interact with the resident who had complained, but Tompkins stated that she could not do that.  Polera Decl. ¶ 7.  E&S was unable to reassign Daudier to work at another facility on short notice, because at the time Ferncliff was E&S's only client.  Daudier Dep. 33–34.  Moreover, to the extent Daudier argues that E&S took an adverse action against Daudier by acquiescing in her suspension by Ferncliff, Daudier has offered no evidence that would give rise to an inference that E&S did so based on a discriminatory motive.  Daudier specifically testified that no employee of E&S ever discriminated against her.  *Id.* at 72.  To the contrary, Daudier attested that Polera was upset and offended by Tompkins's call, and even strategized with Daudier about filing suit against Ferncliff.  Daudier Decl. ¶¶ 21–22.  Finally,  E&S never terminated its contract with Daudier, *see* Daudier Dep. 29–34, 53, and it was E&S that eventually found Daudier a new position at the VA home.  Accordingly, E&S's motion for summary judgment is granted.[14]

------

[14] Finally, Daudier's argument that she was constructively discharged, either by Ferncliff or E&S, *see* Daudier Br. 21–22, is unavailing.  "Constructive discharge of an employee occurs

## CONCLUSION

For the reasons stated, defendants' motions for summary judgment are granted.  The

Clerk of Court is directed to terminate the motion pending at docket number 72, and to close this

case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: August 15, 2013
       New York, New York

---

when an employer, rather than directly discharging an individual, intentionally creates an
intolerable work atmosphere that forces an employee to quit involuntarily." *Whidbee v.
Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) (citation omitted).  But Daudier
did not quit, involuntarily or otherwise.  She was suspended by Ferncliff pending the
investigation into the allegations of misconduct against her, and before that investigation was
completed, Ferncliff and E&S ended their relationship.  After that point, Daudier continued her
contractual relationship with E&S until March 6, 2013.